IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-01565-PAB-BNB

SOLA SALON STUDIOS, LLC,
a Colorado limited liability corporation,

    Plaintiff and Counterclaim-Defendant,

v.

CECELIA HELLER, as successor trustee for the David H. Simon 1971 Trust,
CECELIA HELLER, as successor trustee for the Peter N. Simon 1971 Trust, and
CECELIA HELLER, as successor trustee for the Michael B. Simon 1971 Trust,

    Defendant(s) and Counterclaimant(s).

---

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

---

This state-law contract case comes before the Court on the motion for summary judgment [Docket No. 31] filed by defendant and counterclaimant Cecelia Heller, as successor trustee for the David H. Simon 1971 Trust, the Peter N. Simon 1971 Trust, and the Michael B. Simon 1971 Trust (collectively, the "Trustee"). The Court's jurisdiction is proper under 28 U.S.C. § 1332(a) [*See* Docket Nos. 43, 44, 45].

**I. BACKGROUND**

    **A.  Brief Factual Background**

Plaintiff and counterclaim-defendant Sola Salon Studios, LLC ("Sola") operates a health and beauty salon in a retail development known as Fashion Plaza, located in Denver, Colorado. Sola leases its space in Fashion Plaza from the Trustee, who owns the property. Under its business model, Sola enters into license agreements with individuals who operate as independent contractors in providing various services

related to health and beauty care. Under the license agreements, in exchange for a flat monthly fee, Sola provides each independent contractor with a specific amount of square footage and various services at the Fashion Plaza location.

The dispute between the parties involves a lease that was originally executed on October 1, 2004 and was later amended on August 31, 2005 and October 17, 2006. At the time Sola's lease was executed, and at the two times it was amended, Fashion Plaza was owned by an entity which is not a party to this case. On November 3, 2006, the defendant Trusts purchased the property from this previous owner, making the Trustee the successor in interest to the rights and obligations under the lease. Some time later, disputes arose between Sola and the Trustee regarding the rights and obligations imposed by several provisions in the lease.

The initial disagreement between the parties was related to Sola's financial obligations under the lease. The first aspect of this disagreement has to do with Sola's responsibility for certain operating expenses of Fashion Plaza. The parties disagree about the proper interpretation of a provision in the August 31, 2005 amendment to the lease regarding annual increases to those reimbursable operating expenses. Under Sola's interpretation, the increase is limited to 5% per year. The Trustee, on the other hand, contends that the lease amendment imposes a 105% cap on annual increases. Sola claims that it has paid under protest all expenses which the Trustee has requested under the Trustee's interpretation of there being a 105% cap. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Docket No. 40] ("Pl.'s Resp.") at 10-11 ¶ 27. The Trustee has not specifically refuted this assertion. *See* Def.'s Reply in Supp. of Def.'s Mot. for Summ. J.

[Docket No. 42] ("Def.'s Reply") at 5 ¶ 27.  In the context of the present motion, the Trustee asks the Court to determine, as a matter of law, that her interpretation of the cap on annual increases is the correct one.

The second disagreement between the parties has to do with monies the independent contractors pay to Sola.  It is the Trustee's contention that, pursuant to the lease, Sola must surrender any money it receives from the independent contractors that exceeds the combination of rent and expenses paid to the Trustee and amounts paid for improvements, brokers' fees, and advertising expenses related to procurement of those licensees.[1]  The parties agree that Sola has refused to pay the Trustee the net proceeds derived from the agreements with these individuals.  Based on Sola's refusal to remit these funds, and after this case had been filed, the Trustee sent Sola a notice purporting to terminate the lease.  The Trustee, through her present motion, asks the Court to affirm this termination.

There is another disagreement between the parties relating to the independent contractors to whom Sola grants licenses.  The Trustee claims that Sola's practice in entering into these license agreements without the Trustee's prior approval constitutes a default under the lease.  On November 7, 2008, the Trustee sent Sola an addendum to the original notice of termination identifying Sola's license agreements as an additional basis for termination of the lease.  In her present motion, the Trustee asks the Court to affirm the termination of the lease on this ground as well.  Sola, on the

---

[1] According to Sola, the Trustee's reading of the lease would entitle the landlord to more than just Sola's profits because Sola would not be able to deduct various operating expenses that are not accounted for in the Trustee's proposed calculation.

other hand, claims that its relationship with the independent contractors was fully anticipated and permitted by the lease and, as such, does not constitute a default. In the alternative, Sola claims that, because the Trustee's interpretation of the provision would contradict the intent of the parties at the time they signed the lease, the Court should reform the lease language so as to allow Sola's unapproved contracts with the independent contractors.

The final point of contention between the parties raised by the present motion relates to Sola's assignment of its interests in the license agreements with the independent contractors. In order to facilitate the collateralization of business loans, Sola made three assignments of these interests to lenders. The Trustee claims that these assignments, which were made without her consent, were impermissible under the lease. On February 25, 2009, the Trustee sent a second addendum to the notice of termination, claiming that Sola's assignments of the "License Agreements" breached the lease as well. Sola claims that the "License Agreements" are not interests in the lease and, therefore, no consent was required.

**B. Procedural Background**

In order to resolve the disputes between it and the Trustee, Sola filed this case in the District Court for the City and County of Denver, Colorado on or about June 25, 2008. *See* Notice of Removal [Docket No. 1], ex. A-2 (Compl.). On July 24, 2008, the Trustee removed the case invoking the Court's diversity jurisdiction. *See* Notice of Removal. Following removal, Sola filed an amended complaint asserting ten claims based mostly on contract and quasi-contract theories, seeking declaratory, legal, and

equitable relief. *See* Am. Compl. [Docket No. 19]. The Trustee filed an answer to Sola's amended complaint, which included four counterclaims regarding the same subject matter. *See* Def.'s Am. Answer & Am. Countercl. [Docket No. 20]. The Trustee later amended the four counterclaims but maintained the same basic legal theories. *See* Def.'s Second Am. Countercl. [Docket No. 39].

On February 27, 2009, the Trustee filed the present motion seeking "entry of summary judgment in [her] favor and against Sola on [her] claims for termination of the Lease due to Sola's material breaches thereof, or, in the alternative, for entry of summary judgment on [her] declaratory judgment claim to interpret the unambiguous language of the Lease so as to effectuate its plain meaning." Def.'s Mot. for Summ. J. [Docket No. 31] ("Def.'s Mot.") at 20. On March 23, 2009, Sola filed a response in which it argues that genuine issues of material fact preclude summary judgment. *See* Pl.'s Resp. On April 7, 2009, the Trustee filed a reply in support of her motion for summary judgment. *See* Def.'s Reply. With the motion fully briefed, the Court now addresses the merits.

## II. ANALYSIS

### A. Legal Standard – Summary Judgment

"In diversity cases like this one, the substantive law of the forum state governs the analysis of the underlying claims, but [federal courts] are governed by federal law in determining the propriety of . . . summary judgment."[2] *Hill v. Allstate Ins. Co.*, 479 F.3d

---

[2] With both parties assuming the applicability of Colorado law to the substantive claims in this case, the Court obliges. *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

5

735, 739 (10th Cir. 2007) (internal quotation marks omitted).  According to Federal Rule of Civil Procedure 56, a court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

In the context of a summary judgment motion, a court may consider only admissible evidence.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  In viewing this evidence, courts are to make reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998).

### B.  Cap on Increases in Reimbursed Expenses

The August 31, 2005 amendment to the lease contains a paragraph describing the operating expenses for which Sola is responsible:

> It is hereby agreed that Tenant shall pay to Landlord as Additional Rent during each calendar year during the Term hereof Tenant's Pro Rata

> Share of Operating Expenses. An estimated amount of such Operating Expenses excess shall be payable monthly on the same date and at the same place Base Rent is payable, with an adjustment to be made between the parties at a later date as hereinafter provided. It is further agreed that the annual increase in charges to Tenant for its pro-rata share of Operating Expenses shall not exceed Tenant's pro-rata share of Operating Expenses for the immediately prior calendar year by five percent (5%) per year on a non-cumulative basis. The 2004 Operating Expenses were $231,241.

Def.'s Mot., ex. 11 at 1 ¶ 1. The parties disagree about the effect of the penultimate sentence, which addresses the annual increase in charges. Sola contends that the language imposes and was always intended to impose a maximum 5% percent per annum increase. The Trustee argues that the plain unambiguous language of this sentence limits the increase to 105% rather than 5%, and asks for a judgment as a matter of law adopting its interpretation.

"Contract interpretation is generally a question of law for the court," *City of Aurora v. ACJ P'ship*, 209 P.3d 1076, 1085 (Colo. 2009), with "the primary goal" being "to determine and effectuate the intent and reasonable expectations of the parties." *Copper Mountain, Inc. v. Industrial Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009). To this end, "the court should give effect to the plain and generally accepted meaning of the contractual language," *Copper Mountain, Inc.*, 208 P.3d at 697, while keeping in mind that this meaning will not apply where parties have given the words their own significance. *See Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313-14 (Colo. 1984) ("In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning."). Either way, "[t]he court should interpret a contract in its entirety with

7

the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Copper Mountain, Inc.*, 208 P.3d at 697 (internal quotation marks omitted). Lastly, "[i]t is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Pepcol Mfg. Co.*, 687 P.2d at 1314.

Like the interpretation of a contract more generally, the issue of whether a contract is ambiguous is decided as a question of law. *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005). "A contract is ambiguous when it is reasonably susceptible to more than one meaning." *Public Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). Much like standard contract interpretation, "[i]n determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the agreement's provisions*." Lake Durango Water Co., Inc. v. Public Utilities Comm'n*, 67 P.3d 12, 20 (Colo. 2003). "A mere disagreement between the parties as to the interpretation of an agreement does not in itself create an ambiguity as a matter of law." *City of Aurora v. ACJ P'ship*, 209 P.3d 1076, 1085 (Colo. 2009). Because "courts no longer apply a rigid 'four corners' rule . . . extrinsic evidence may be conditionally admitted to determine whether the contract is ambiguous." *East Ridge of Fort Collins*, 109 P.3d at 974 (citation omitted). Finally, "[w]hen an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be

determined in the same manner as other factual issues." *East Ridge of Fort Collins*, 109 P.3d at 974.

The contractual language at issue here – "[i]t is further agreed that the annual increase in charges to Tenant for its pro-rata share of Operating Expenses shall not exceed Tenant's pro-rata share of Operating Expenses for the immediately prior calendar year by five percent (5%) per year on a non-cumulative basis" – is facially confusing and ambiguous. The Trustee's proffered interpretation of the sentence, as permitting an *increase* in charges that matches the previous year's expense plus an additional 5%, is reasonable based on one reading of the sentence. However, Sola's proposed interpretation, as permitting only an increase which equals 5% of the previous year's total, also is reasonable. The phrase "increase in charges" could mean the total charges incorporating the annual increase. In fact, this reading is supported by all of the extrinsic evidence offered by the parties that may be consulted to resolve an ambiguity. For example, in an email between two individuals working on behalf of the previous landlord in developing the August 31, 2005 amendment, one party wrote: "please note the working of the *5%* non-cumulative gap [sic]." Pl.'s Resp., ex. 13 at 1 (emphasis added). Despite the weight of the extrinsic evidence, the ambiguity cannot be resolved at this juncture. The Court cannot find that, as a matter of law, all reasonable juries would interpret the contract in a similar way. Therefore, the Court finds that the penultimate sentence in paragraph 1 of the lease amendment is ambiguous and that a jury must resolve the ambiguity. Due to the need for such jury

9

findings, the Court cannot grant the Trustee summary judgment on the effect of the sentence.

### C. Alleged Breaches of the Lease

The Trustee's request for judgment as a matter of law that the termination of the lease was proper turns on whether Sola defaulted under the lease. Under paragraph 19B of the lease, "[i]f any one or more Event of Default shall happen, then Landlord shall have the right at Landlord's election, then or at any time thereafter, . . . [t]o give Tenant written notice of intention to terminate this Lease on the date of such given notice or on any later date specified therein . . . ." Def.'s Mot., ex. A-2 at 12 ¶ 19B-19.B.2. "Events of Default" are described earlier in paragraph 19A of the lease. Neither the Trustee's counterclaim nor her motion for summary judgment specifically correlates her claims of breach with the listed "Events of Default" in paragraph 19A. However, based on the pleadings and the briefs, the Court identifies the following such events from the list in paragraph 19A as relevant: 1) "Tenant shall fail to pay when due any installment of Base Rent, Additional Rent or any other amounts payable hereunder;" 2) "This Lease or the estate of Tenant hereunder shall be transferred to or shall pass to or devolve upon any other person or party in violation of the provisions of this Lease, except as permitted herein;" and 3) "Tenant shall fail to perform any of the other agreements, terms, covenants or conditions hereof on Tenant's part to be performed, and such nonperformance shall continue for a period of fifteen (15) days after notice thereof by Landlord to Tenant; provided, however, that if Tenant cannot reasonably cure such nonperformance within fifteen (15) days, Tenant shall not be in

default if it commences cure within said fifteen (15) days and diligently pursues the same to completion, with completion occurring in all instances within sixty (60) days." Def.'s Mot., ex. A-2 at 11-12 ¶¶ 19A.1, 2 & 7.

### *1. Monies Due Under Paragraph 17E*

The Trustee's alleged entitlement to Sola's net proceeds from the independent contractors described above, and the Trustee's termination of the lease based on Sola's failure to deliver these proceeds, depends on the independent contractors being covered by paragraph 17E of the lease. Paragraph 17E states:

> If Tenant collects any Rent or other amounts from a subtenant or assignee in excess of The Base Rent and Tenant's Pro Rata Share of increases in Operating Expenses, Tenant shall pay the Landlord as and when Tenant receives the same, all such excess amounts received by Tenant less amounts actually paid by Tenant for improvements, brokers' fees, or advertising expenses related to procurement of a subtenant.

Def.'s Mot., ex. A-2 at 11 ¶ 17E.

Paragraph 17E, on its face, applies only to subtenants and assignees. The Trustee appears to concede that the independent contractors are licensees of Sola, not subtenants or assignees. *See* Def.'s Mot. at 17; Def.'s Reply at 8; *see also* Def.'s Mot. at 13-15 (arguing that Sola defaulted under the lease by using licenses without the Trustee's consent, rather than subleases). The Trustee argues that paragraph 6 of the lease, which describes Sola's "Character of Occupancy," contemplates only the use of subleases to the independent contractors, not licenses. Paragraph 6 states the following:

> The Premises are to be occupied for operation of a salon with individual studios subleased by Tenant to stylists, professionals, and therapits [sic] specializing in beauty or health care services, including one or more of the

11

> following: cutting, styling and coloring hair, manicures, pedicures, facials, massage, acupuncture, skin care services, blended cosmetics and for sale of hair care and cosmetics products and related retail products, general office purposes, and for no other purpose without the prior written consent of Landlord.

Def.'s Mot., ex. A-2 at 6 ¶ 6A. The Trustee argues that Sola should not be permitted to avoid Paragraph 17E merely by using licenses rather than subleases. However, she fails to provide a legal mechanism by which the Court could convert the licenses to subleases, thereby bringing them under the purview of paragraph 17E. Without such a mechanism, the Court cannot hold, as a matter of law, that the Trustee was entitled to the types of proceeds described in paragraph 17E as they would derive from the independent contractors at Sola's Fashion Plaza establishment. Because the Court cannot make such a holding, it also cannot hold, as a matter of law, that Sola's failure to remit these proceeds constituted a default which would have permitted the Trustee to terminate the lease.

### 2. *Sola's Licenses to the Independent Contractors*

According to the Trustee, "Sola defaulted under the Lease because it entered into the License Agreements without Defendant's prior written consent." Def.'s Mot. at 13. The section of the lease on assignment and subletting explains that:

> Except as hereinafter specifically authorized, Tenant shall not assign this Lease or any interest therein, or sublet all or any part of the Premises, or permit any part of the Premises to be used or occupied by any persons other than Tenant and its employees, by operation of law or otherwise, nor shall Tenant permit any part of the Premises to be used or occupied by any licensee or concessionaire or permit any persons other than Tenant, its employees and invitees, to be upon the Premises.

Def.'s Mot., ex. A-2 at 10 ¶ 17A. The next paragraph of the lease offers an exception to this general prohibition:

> Except for specific uses, licenses, and subleases to salon professionals and others as set forth in paragraph 6A of this Lease, Tenant shall not sublet any part of the Premises, nor assign this Lease or any interest therein without the written consent of the Landlord first being obtained, which said consent shall not be unreasonably withheld . . . .

Def.'s Mot., ex. A-2 at 10 ¶ 17B. Paragraph 6A, as discussed above, describes Sola's "Character of Occupancy" as follows:

> The Premises are to be occupied for operation of a salon with individual studios subleased by Tenant to stylists, professionals, and therapits [sic] specializing in beauty or health care services, including one or more of the following: cutting, styling and coloring hair, manicures, pedicures, facials, massage, acupuncture, skin care services, blended cosmetics and for sale of hair care and cosmetics products and related retail products, general office purposes, and for no other purpose without the prior written consent of Landlord.

Def.'s Mot., ex. A-2 at 6 ¶ 6A.

The question is whether, under the three paragraphs quoted here, Sola was required to seek the consent of the Trustee or the previous landlord prior to entering into the license agreements with the independent contractors. In answering this question, the Court must employ the interpretive standards of contract law. The Court first addresses whether the language of the first sentence of paragraph 17B – "Except for specific uses, licenses, and subleases to salon professionals and others as set forth in paragraph 6A of this Lease . . . ." – is ambiguous.

The Trustee argues that this clause points to paragraph 6A to define both the types of services to be performed – e.g., cutting, styling, and coloring hair – and the

13

nature of the business relationship between Sola and the salon professionals – e.g., licenses or subleases. The Court believes this interpretation to be reasonable.

Sola first appears to argue that paragraph 17B could be read to refer to paragraph 6A only to modify the term "others." According to this interpretation, paragraph 17B uses paragraph 6A to incorporate the types of individuals beyond salon professionals listed in that paragraph – namely, stylists and therapists. While the Court finds this interpretation less compelling, the absence of a comma following the word "others" does make it reasonable on a grammatical level.

Sola alternatively suggests that reading paragraphs 17B and 6A to prohibit licenses at Sola's business would conflict with the admonition that "[t]he court should interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Copper Mountain, Inc.*, 208 P.3d at 697. Sola argues that the prohibition of "licenses" would make that word a nullity in the sentence. Sola appears to suggest that, by operation of paragraph 17B, the term "license" should be read into the description provided in paragraph 6A. There is at least some appeal to Sola's reasoning.

It is reasonable to read paragraphs 17B and 6A in conjunction, and in their entirety, to contemplate licensing space to the individuals listed in paragraph 6A. One could reasonably read paragraph 17B to be the more specific and, therefore, the controlling provision of the lease regarding the types of arrangements Sola could enter into without first seeking the landlord's permission. *Cf. Massingill v. State Farm Mut. Auto. Ins. Co.*, 176 P.3d 816, 825 (Colo. App. 2007) (citing *E-470 Pub. Highway Auth.*

14

*v. Jagow*, 30 P.3d 798, 801 (Colo. App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002)) ("It is a basic principle of contract interpretation that a more specific provision controls the effect of more general provisions in a contract."). Finally, the prohibitory portion of the first sentence of paragraph 17B – "Tenant shall not sublet any part of the Premises, nor assign this Lease or any interest therein without the written consent of the Landlord first being obtained" – makes no reference to licenses. This lends further support to a reading that licenses are permissible under the paragraph. While the lease as a whole makes a number references to "licenses" or "licensees," it fails to fully account for such agreements and individuals under all of the provisions of the lease.

Paragraph 17B's description of Sola's ability to enter into license agreements without the permission of the landlord is reasonably susceptible to more than one meaning. Therefore, the contract language is ambiguous and its meaning must be decided as an issue of fact. *See East Ridge of Fort Collins*, 109 P.3d at 974. Because the language cannot be interpreted without the input of the jury, the Court can make no judgment as to whether Sola breached paragraph 17B and, by extension, defaulted under paragraph 19A.2 of the lease. Therefore, with this genuine dispute regarding a material fact existing, summary judgment is not appropriate on this issue.

### 3. Sola's Assignment of Its Interests in the Licenses to Lenders

The third and final basis for the Trustee's termination of the lease is Sola's assignment of its interests in the license agreements. Sola assigned these interests to two consecutive lenders to be used as collateral for a business loan. The Trustee contends that these assignments constituted Events of Default under the lease. The

Trustee bases her arguments on the belief that Sola's interests in the license agreements constitute interests in the lease itself. As a consequence, the Trustee argues that Sola violated paragraph 17B's requirement that "Tenant shall not sublet any part of the Premises, nor assign this Lease or any interest therein without the written consent of the Landlord first being obtained." Def.'s Mot., ex. A-2 at 10 ¶ 17B. The Trustee also claims that the assignments violated paragraph 17C of the lease, which states:

> Notwithstanding anything contained above to the contrary, in the event Tenant requests Landlord's consent to sublet twenty-five percent (25%) or more [sic] the premises or to assign twenty-five percent (25%) or more of its interest in this Lease, Landlord shall have a right to . . . refuse to grant such consent and terminate this Lease as to the portion of the Premises with respect to which such consent was requested; provided, however, if Landlord refuses to grant such consent and elects to terminate the Lease as to such portion of the Premises, Tenant shall have the right within fifteen (15) days after notice of Landlord's exercise of its right to terminate to withdraw Tenant's request for such consent and remain in possession of the Premises under the terms and conditions of this Lease. . . .

Def.'s Mot., ex. A-2 at 11 ¶ 17C(iii).

Addressing first paragraph 17(C)(iii), the Trustee's claim fails because it is, at the very least, disputed whether the paragraph was triggered by a request from Sola to assign 25% or more of its interest in the lease. Sola claims that it never made such a request. According to Sola, the first lender, Vectra Bank, upon its own initiative, sent a letter to the Trustee requesting some form of consent, which the Trustee refused. *See* Pl.'s Resp. at 5 ¶ 28. The Trustee does not dispute this assertion. *See* Def.'s Reply at 3 ¶ 28. Therefore, paragraph 17(C)(iii) has no apparent applicability under the

16

undisputed facts of this case and summary judgment cannot be granted affirming termination of the lease based upon default under this provision.

Summary judgment also is inappropriate with respect to the Trustee's termination of the lease based on paragraph 17B and the assignment as collateral of the independent-contractor licenses. According to paragraph 17B, "Tenant shall not sublet any part of the Premises, *nor assign this Lease or any interest therein* without the written consent of the Landlord first being obtained." Def.'s Mot., ex. A-2 at 10 ¶ 17B (emphasis added). The Court finds that the phrase "any interest therein" also is ambiguous in a way that is material to the present case. On the one hand, it may refer to interests in the document itself. The lease is the agreement between Sola and the landlord which governs their relationship. The case law which the Trustee cites in the motion for summary judgment appears to deal with circumstances surrounding the assignment of the actual lease agreement. *See* Def.'s Mot. at 16-17. That, of course, is not what the Trustee accuses Sola of doing.

Paragraph 17B also could be read to prohibit the unauthorized assignment of any interest *described* in the lease. This far more expansive view of the language would then require a more searching analysis of the license agreements and the interests conveyed by the lease. Because the Court finds both potential readings reasonable, this portion of paragraph 17B is ambiguous as well. This case is before the Court on the Trustee's motion for summary judgment. The ambiguity of the phrase stands as a genuine issue of material fact to be resolved by the jury and which precludes summary judgment in the Trustee's favor.

### D. Reformation of the Lease Language

In its response to the Trustee's motion for summary judgment, Sola has argued that reformation would be appropriate should the Court adopt the Trustee's proffered interpretations. Because the Court has not adopted those interpretations and, instead, must await jury findings in order to clarify the ambiguities in the language, Sola's request for reformation is premature. Therefore, the Court makes no determinations regarding reformation of the lease language at this time.

### III. CONCLUSION

Based on the foregoing, it is

**ORDERED** that the motion for summary judgment [Docket No. 31] filed by defendant and counterclaimant Cecelia Heller, as successor trustee for the David H. Simon 1971 Trust, the Peter N. Simon 1971 Trust, and the Michael B. Simon 1971 Trust, is DENIED.

DATED July 16, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge